# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HEALTHCARE EMPLOYEES UNION,
LOCAL 399, AFFILIATED WITH THE
SERVICE EMPLOYEES INTERNATIONAL
UNION, AFL-CIO,
                    *Petitioner,*

           v.

NATIONAL LABOR RELATIONS
BOARD,
                    *Respondent,*

ST. VINCENT MEDICAL CENTER,
           *Respondent-Intervenor.*

No. 03-72029

NLRB No.
31-CA-24325

ORDER AND
OPINION

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted
February 9, 2005—Pasadena, California

Filed September 11, 2006

Before: Harry Pregerson, William C. Canby, Jr., and
Robert R. Beezer, Circuit Judges.

Opinion by Judge Pregerson;
Dissent by Judge Beezer

11007

## COUNSEL

David A. Rosenfeld (brief & argued) and M. Suzanne Murphy (brief), Weinberg, Roger & Rosenfeld, Oakland, California, for the petitioner.

Meredith L. Jason (argued) and David Habenstreit and Jill A. Griffin (brief), National Labor Relations Board, Washington, D.C., for the respondent.

Gordon A. Letter (brief and argued), Littler Mendelson, Los Angeles, California, for respondent-intervenor.

## ORDER

The opinion and dissent filed March 17, 2006, slip op. 2743, and appearing at 441 F.3d 670 are hereby withdrawn. A new opinion and dissent shall be filed concurrently with this order.

Judges Pregerson and Canby voted to deny the petitions for panel rehearing. Judge Beezer voted to grant the petitions for panel rehearing. Judge Pregerson voted to deny the petitions for rehearing en banc, and Judges Canby and Beezer so recommend.

The full court has been advised of the petitions for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35. Accordingly, the petitions for panel rehearing and the petitions for rehearing en banc are hereby **DENIED**. No further petitions shall be entertained.

---

## OPINION

PREGERSON, Circuit Judge:

Healthcare Employees Union Local 399 (the "Union") petitions this court to review a final order of the National Labor Relations Board (the "Board" or "NLRB"). The Board's order dismissed the Union's unfair labor practice charge against St. Vincent Medical Center ("St. Vincent").

In its unfair labor practice charge, the Union alleged that St. Vincent subcontracted out the work of the hospital's respiratory care department on the eve of a union election to prevent employees in that department from voting in the election, in violation of Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 158(a)(1), 158(a)(3).

After a hearing, an administrative law judge ("ALJ") ruled that the Union failed to carry its burden of persuasion that anti-union animus was a motivating factor in St. Vincent's subcontracting decision and dismissed the complaint. That ruling was affirmed by the Board. In addition, the Board ruled that even if the Union had carried its burden of persuasion, St. Vincent demonstrated that it would have subcontracted out the work of the department in the absence of union organizing activity.

We have jurisdiction under 29 U.S.C. § 160(f). For the reasons stated below, we grant the Union's petition for review and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

St. Vincent Medical Center is an acute care hospital located in Los Angeles, California. Before subcontracting[1] out the work of the respiratory care ("RC") department in February 2000, St. Vincent employed twenty-seven respiratory care therapists. RC therapists are responsible for administering respiratory care treatment (i.e., administering intubations, ventilators, or life support systems) throughout the hospital. In addition to providing respiratory care treatment, RC therapists are responsible for assessing each patient's health and reporting each patient's status to on-coming shift employees and doctors.

A. *Management Problems in the Respiratory Care Department*

St. Vincent contends that it outsourced the work of its RC department in February 2000 because it was unable to find and train suitable managers. St. Vincent's difficulty with management of the RC department had existed for a long time before the work of that department was actually subcontracted out. In fact, while the RC department's problems became more evident in the three years before the outsourcing decision, the hospital had comparable problems with its RC department for nearly thirteen years.

Despite the replacement of the RC department's manager in early 1999, the department's productivity standards continued to remain lower than those of other departments. Several RC employees testified that during 1999 they encountered problems that hindered them from accomplishing their assigned tasks. During that time they complained regularly to

---

[1]We use "subcontracting," "subcontracting out," and "outsourcing" interchangeably in this opinion to refer to the arrangement whereby St. Vincent contracted with a third party to operate the Respiratory Care department at the hospital.

management about a lack of proper billing codes, lack of proper respiratory equipment, and general staffing problems.

The ongoing problems in the RC department did not go unnoticed by upper-level management.[2] In the summer and fall of 1999 Ray Hancock and Ramon Suarez, both RC department managers, met regularly with Zita Uy, assistant administrator for the RC department, to discuss the problems in the RC department.

## B. *The Union Campaign*

The Union began its campaign to organize the hospital's technical staff in July 1999, when it assigned between three and four full-time organizers to St. Vincent.[3] Union organizers, easily identified by their distinctive T-shirts, spoke openly to employees at the hospital and passed out pro-union fliers several times a week. In early July, the Union picketed in front of the hospital as hospital managers stood by watching.[4] Union organizers also stationed themselves in the hospital cafeteria between ten and twenty times a month and spoke to employees about the Union. As the campaign progressed, Union organizers made regular home visits to hospital staff to discuss the benefits of joining the Union. The Union's efforts proved successful, as the ALJ found that most of the Union's

---

[2]The hospital's Charge Audit Committee (founded in April 1999 and responsible for auditing charts, documentation, and billing in the various departments), issued regular reports in summer and fall of 1999 scrutinizing the RC department's problems with tracking treatments and with providing proper billing information.

[3]In early 1998, the Union first undertook to organize the hospital's technical staff, which included the RC department. At that time, the Union assigned one part-time organizer to the campaign. The ALJ found that while the organizing activities were initially minimal, St. Vincent managers became aware of the organizing activities almost immediately.

[4]It is unclear from the record exactly who from management was watching and whether the Union picketed the hospital on several occasions or on a single day.

success in securing union authorization cards from employees occurred after mid-1999.[5]

The ALJ concluded that St. Vincent "admittedly made a studied effort to keep track of [the Union.]"[6] Mary Hill, director of human resources for the hospital, testified that she asked her supervisors and managers to "let [her] know of any Union activity, whether that be leafletting or if employees are informing them of home visits, presence in the cafeteria, that sort of thing." Several RC department managers and one Union organizer testified about their open encounters with each other in and around the hospital.[7] Another RC employee testified that during a meeting in 1999, Hancock, an RC department manager, stated that the Union only wanted money from the RC employees.[8]

---

[5]An employee signs a union authorization card to demonstrate his or her willingness to become a member of the union. A union will normally submit the signed authorization cards to the Board in support of its petition for an election. *See Patrick Hardin & John E. Higgins, Jr., The Developing Labor Law 501 (4th ed. 2001).*

[6]The ALJ's findings and rulings can be found with the Board's decision in *St. Vincent Med. Ctr.*, 338 NLRB No. 130, 2003 WL 1785029 (Mar. 31, 2003).

[7]On one occasion, Uy identified herself to a Union organizer as the head administrator of the RC department and asked for leaflets. Hancock, the manager of the RC department, testified that he also saw some of the Union fliers during 1999. One union organizer, Terence Courtney, testified that he and Bill Parente, the hospital president, would see each other regularly as Parente drove in and out of the hospital. Courtney testified that Parente knew him on a first name basis.

[8]The Union also points out that Hancock stated in one meeting in 1999 that the hospital "didn't like unions." But the ALJ specifically credited Hancock's denial of this statement. "Credibility determinations by the ALJ are given great deference, and are upheld unless they are inherently incredible or patently unreasonable." *Retlaw Broadcasting Co. v. NLRB*, 53 F.3d 1002, 1006 (9th Cir. 1995) (internal quotations marks and citation omitted). The Union offers no reason why the ALJ's determination of Hancock's credibility is incredible or patently unreasonable. We therefore defer to the ALJ's credibility determination and uphold his finding that Hancock never stated that the hospital "didn't like unions."

The RC department, which made up twenty-five percent of the technical staff at the hospital, overwhelmingly supported the Union. The ALJ found that

> [St. Vincent] could not have failed to have identified the RC employees as the core of the Union's supporters among the hospital's employees, and that [St. Vincent] may well have deduced, and probably did deduce, from such intelligence that the RC employees were the most likely proselytes of the Union's cause in other departments.

A lead organizer for the union, Roberto De La Cruz, testified that the RC department was "one of the strongest units" and that RC employees were "instrumental in pushing the [organizing] drive." De La Cruz testified that the RC employees comprised a majority of the organizing committee, which helped "[the Union staff] strategize as to how to proceed in the campaign and [identify] other workers." Between nine and twelve RC employees were openly pro-union. They discussed the Union with co-workers at work, openly talked to Union organizers, and passed out pro-union fliers in front of the hospital. De La Cruz testified that Union organizers held the RC department out to other departments in the technical staff as a strong pro-union department. About ninety-five percent of the RC employees ultimately signed union authorization cards.

In a flier dated November 10, 1999, and distributed throughout the hospital's technical staff, the Union announced that it was a "few weeks" away from filing an election petition with the Board. The flier also announced that once the election petition was filed, the Board would set an election within forty-five to sixty days.[9]

---

[9]St. Vincent produced the flier at the hearing pursuant to a subpoena.

On January 5, 2000, the Union filed a petition for an election with the Board for the bargaining unit of one-hundred technical staff employees, which included the twenty-seven RC therapists. On January 21, 2000, the parties stipulated to an election to be conducted by the Board on February 18, 2000.

## C.  *Subcontracting Discussions*

In July 1999, the same month that the Union began its campaign to organize the technical staff, Uy met with Eleanor Ramirez, the senior assistant administrator in charge of patient services. During that meeting Uy and Ramirez first discussed subcontracting out the work of the RC department. Uy testified that she and Ramirez briefly discussed the successful use of subcontracting to alleviate "quality issues" in other departments at St. Vincent. She further testified that she and Ramirez agreed to reassess the situation "later on that year." They did not, however, speak to Bill Parente, the hospital president, or other St. Vincent managers about subcontracting out the work of the RC department.

On November 18, 1999, eight days after the Union announced it was close to filing an election petition with the Board, Uy met with RC department managers Suarez and Hancock to discuss the RC department. At that meeting, both Hancock and Suarez raised the option of subcontracting out the work of the RC department. Suarez stated that he was unable to manage the department. He also stated that both he and Hancock agreed that someone more experienced would be a better department manager. The next day, Ramirez authorized Uy to investigate potential subcontracting vendors.

On December 20, 1999, Uy and Ramirez met again to discuss subcontracting.[10] Uy testified that she and Ramirez rec-

---

[10]The ALJ found that in mid-December 1999, around the same time that St. Vincent managers discussed outsourcing the RC department, RC department employees engaged in concerted activity by collectively protesting the implementation of new overtime pay provisions.

ognized that subcontracting would "be very expensive" and financially infeasible. But she testified that neither she nor Ramirez wanted to simply change managers. Uy stated that she had tried unsuccessfully to replace managers before and wanted to try a different approach. Both Uy and Ramirez testified that they believed one of the primary benefits to outsourcing was that the burden of finding good managers for the department would fall on the subcontractor, not on St. Vincent. While Ramirez testified that she knew that the RC employees would be disenfranchised by outsourcing the work of the department, she also testified that this "was not what [she] would call a big player role in our discussions."

On December 22, 1999, Uy, Ramirez, Hill, and Parente met by phone to discuss subcontracting. Uy testified that no one mentioned the Union during the conversation. Parente, the ultimate decision maker, approved moving forward with finding a subcontractor.

Five days later, Uy announced to RC employees management's intent to investigate outsourcing the work of the RC department. Uy told employees that it would take between thirty and sixty days to investigate possible subcontractors. According to Uy, she explained to the RC employees that the decision was a "business decision" motivated by "concerns about quality issues" and the various complaints received concerning the department.

D. *Implementing Subcontracting — January and February 2000*

On or around January 3, 2000, Uy contacted Total Rehab Care and Interstate Rehab Care and solicited proposals for taking over the RC department. Uy stated that the successful bidder must provide an experienced respiratory manager and agree to hire all current employees at similar wages and benefits. Theodore Weiner, the president and CEO of Total Rehab Care, testified that his company was too small to handle a

subcontracting arrangement involving twenty-seven employees before February 15, 2000, the start-up date required by St. Vincent. February 15, 2000, was three days before the scheduled Union election.

The two companies ultimately contacted each other and submitted a combined proposal, which St. Vincent received on January 26, 2000. The proposal was submitted under the name of California Respiratory Services, a subsidiary of Interstate Rehab Care. Under the proposal, Weiner would work for Total Rehab Care, which contracted with California Respiratory Services to provide management services. Though the proposal was open until March 26, 2000, St. Vincent agreed to the proposal on or about January 26, 2000 — the same day it was received.

On February 1, 2000, about three weeks after the Union filed its election petition with the Board, St. Vincent management informed the RC department of the outsourcing decision. Ramirez announced that California Respiratory Services would take over the RC department, and that, effective February 5, 2000, California Respiratory Services would directly employ the RC employees.

Parente, the hospital president, testified that he did not decide to subcontract the work of the RC department to prevent the RC therapists from voting in the upcoming union election. He did admit, however, that he was aware of the union election scheduled for February 18, 2000 when he made his final decision to subcontract a little over two weeks earlier. When pressed by the ALJ to explain the timing of the subcontracting decision, Parente responded that it was not precipitated by any "emergency" in patient care.[11] Rather, Par-

---

[11]As the ALJ stated at the hearing, he was unable to find that "there was any emergency of any sort, either in July 1999 or in December 1999, nor in January or February of 2000." One RC employee even testified that Uy presented the RC department with the results of a patient survey from December 1999 rating the RC department as the *most appreciated* among the hospital staff.

ente explained that "it was a reasonable management decision within our prerogative at the time and we made the decision" and that "there was a strong possibility that a serious error could occur in a treatment of a patient."

Parente further testified that he did not want to outsource the work of RC department managers while continuing to directly employ RC therapists. He explained that such an arrangement would create a "divided accountability" problem. Parente stated that in his opinion, "the [RC] employees and the manager [of the RC department] belong in the same organization." He also explained that the subcontracting arrangement in another department of the hospital "was a workable model that would have achieved [St. Vincent's] goals." Contrary to Parente's goal of preventing divided accountability, Weiner, the new RC manager, and the RC employees were *not* employed by the same employer because the RC employees worked directly for California Respiratory Services while Weiner and the department managers worked for Total Rehab Care. This arrangement clearly resulted in divided accountability because the RC therapists were accountable to California Respiratory Services while the managers were accountable to Total Rehab Care.

The ALJ found that "[a]fter the subcontracting took effect, the same employees continued to do largely the same work in the same place," and that "the same supervisors . . . were also hired by the subcontractor." Nevertheless, Weiner testified that the RC department improved somewhat after the subcontracting. Fewer physicians complained about RC department services and some hospital staff members even commented on the improvement of the RC department.

E.   *The Present Unfair Labor Practice Charges and the NLRB's Decision*

On February 2, 2000, the Union filed an unfair labor practice charge against St. Vincent. The Union charged that St.

Vincent subcontracted out the work of the RC department to prevent RC department employees from voting in the Union election, in violation of Sections 8(a)(1) and 8(a)(3) of the NLRA.

On March 22, 2000, the Board's General Counsel issued a complaint against St. Vincent and a notice of hearing. In its answer to the complaint, St. Vincent denied the allegations and alleged as an affirmative defense that its subcontracting decision was based on valid business reasons unrelated to the union organizing activities of the RC department.

The matter was heard before an ALJ. *See St. Vincent Med. Ctr.*, 338 NLRB No. 130, 2003 WL 1785029, *1 (Mar. 31, 2003). The ALJ analyzed the General Counsel's case under *Wright Line*, 251 N.L.R.B. 1083, *enforced*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989 (1982). The ALJ credited the General Counsel's "clear evidence" that St. Vincent knew that the RC department was the "core" of the Union's organizing drive, and that the Union's organizing campaign burgeoned in July 1999. The ALJ also concluded that the timing of the terminations militated in favor of the General Counsel's case:

> Announcing the change in the status of the employees, and subcontracting out their work, only about 3 weeks after the filing of the petition for an election seems on its face so suspicious that if there were any evidence of animus or direct intent to discriminate that one would not hesitate to find the subcontracting to have been violative of the [NLRA] . . . .

In further support of the General Counsel's case, the ALJ found that the alleged motivation behind St. Vincent's subcontracting decision "seem[ed] to lack plausibility" and noted the "seeming lack of a clear rationale for the way in which [the subcontracting decision] was carried out." The ALJ noted that St. Vincent's asserted business justification was "almost

too much to believe" and that "[o]n its surface it appear[ed] to be a fabrication, and not a very good one at that."

Notwithstanding these findings, the ALJ found that there was no reason "to ignore or disbelieve the testimony of [St. Vincent's] witnesses to the effect that since the subcontracting the problems have largely vanished." After crediting St. Vincent on this point, the ALJ concluded that the General Counsel failed to carry its burden of persuasion under *Wright Line*. The ALJ stated that "no matter how improbable [St. Vincent's] action, or its timing, in subcontracting may seem . . . on the surface, there is no reasonable basis on this record . . . causing me to doubt or challenge the very fact of its success in, at long last, remedying the RC department's longstanding, seemingly intractable, problems." After finding that changing managers is a "time honored and frequently used solution to management problems," the ALJ concluded, "no matter how reluctantly," that St. Vincent's decision "passe[d] muster."

The Union and the General Counsel appealed the ALJ's decision to the Board. In its brief boilerplate decision, the Board affirmed the ALJ's rulings and findings. Furthermore, the Board concluded that

> [a]ssuming arguendo that the General Counsel satisfied his initial burden under *Wright Line*, we find that [St. Vincent] has proven its affirmative defense under *Wright Line* of demonstrating that it would have taken the same action even in the absence of the employees' protected activities. Specifically, [St. Vincent] has established that it implemented its subcontracting decision within the 30-to-60 day timeframe it announced prior to the filing of the petition for a representation election.

*St. Vincent Med. Ctr.*, 2003 WL 1785029, at *1 n.4 (internal citation omitted).

The Union filed this petition for review pursuant to Section 10(f) of the NLRA, 29 U.S.C. § 160(f). The Union challenges both the Board's conclusion that the General Counsel failed to carry its burden of persuasion, and its conclusion that St. Vincent established its affirmative defense under *Wright Line*. The Union argues that neither conclusion is supported by substantial evidence on the record as a whole.

## STANDARD OF REVIEW

"Courts of appeals may overturn Board decisions only if the Board's findings of fact are not supported by substantial evidence, or if the Board has incorrectly applied the law."[12] *Cal. Pac. Med. Ctr. v. NLRB*, 87 F.3d 304, 307 (9th Cir. 1996); *see also NLRB v. Nevis Indus., Inc.*, 647 F.2d 905, 908 (9th Cir. 1981) ("The Board's findings must be enforced if supported by substantial evidence, even if this court might reach a different conclusion based on the same evidence."). However, "[t]he substantial evidence test requires a case-by-case analysis and a review of the whole record," *Cal. Pac. Med. Ctr.*, 87 F.3d at 307, and requires a reviewing court to "take into account whatever in the record fairly detracts" from the Board's conclusions, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

Similarly, while we should be mindful that "the determination of motive is particularly within the purview of the NLRB," *Lippincott Indus., Inc. v. NLRB*, 661 F.2d 112, 116 (9th Cir. 1981), "we may set aside the Board's determination of motive if we find that it is not supported by substantial evi-

---

[12]Counsel for the Board, relying on *Chamber of Commerce v. NLRB*, 574 F.2d 457, 463 (9th Cir. 1978), states in its brief that we must uphold the Board's decision unless it has no rational basis. The weight of authority, however, makes clear we review the Board's conclusions for "substantial evidence in the record as a whole." *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Dash v. NLRB*, 793 F.2d 1062, 1065-66 (9th Cir. 1986); *Gen. Teamsters Local 162 v. NLRB*, 782 F.2d 839, 842 (9th Cir. 1986).

dence," *Dash v. NLRB*, 793 F.2d 1062, 1066 n.6 (9th Cir. 1986).

## ANALYSIS

**[1]** Section 8(a)(3) of the NLRA prohibits an employer from discriminating against employees "in regard to hire or tenure of employment . . . to discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

**[2]** Subcontracting decisions are not immune from the reach of the NLRA. Thus, it is well-established that an employer violates Section 8(a)(3) of the NLRA where it "close[s] a part of [its] operations, discharge[s] the employees involved, and subcontract[s] the work for anti-Union purposes."[13] *Great Chinese Am. Sewing Co. v. NLRB*, 578 F.2d 251, 255 (9th Cir. 1978); *see also Textile Workers Union of Am. v. Darlington Mfg. Co.*, 380 U.S. 263, 272 n.16 (1965); *Reno Hilton Resorts v. NLRB*, 196 F.3d 1275, 1282-83 (D.C. Cir. 1999); *NLRB v. Joy Recovery Tech. Corp.*, 134 F.3d 1307, 1314-15 (7th Cir. 1998).

In a Section 8(a)(3) case such as this, the Board uses the burden-shifting scheme set forth in *Wright Line* to determine whether an employer was motivated by anti-union animus. *See* 251 N.L.R.B. at 1089; *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 399-403 (1983) (upholding *Wright Line* burden shifting scheme under the NLRA), *overruled on other grounds by Office of Workers' Comp. Program v. Greenwich Collieries*, 512 U.S. 267, 276-78 (1994); *see also Dash*, 793 F.2d at 1066. Under *Wright Line*, the Board requires that

---

[13]The Union does not argue that St. Vincent violated Section 8(a)(1) of the NLRA for reasons different from those it relies on to support its Section 8(a)(3) charge. Consequently, we treat the Union's charge under Section 8(a)(1) as a derivative of its Section 8(a)(3) charge. *See NLRB v. Swedish Hosp. Med. Ctr.*, 619 F.2d 33, 35 (9th Cir. 1980) ("Any violation of Section 8(a)(3) . . . necessarily includes a derivative violation of Section 8(a)(1).").

the General Counsel make a prima facie showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of protected conduct.

251 N.L.R.B. at 1089. While the General Counsel retains the ultimate burden of persuasion, "once the General Counsel establishes that anti-union animus was a motivating factor, the employer bears the burden of establishing any affirmative defense such as the inevitability of termination." *Schaeff Inc. v. NLRB*, 113 F.3d 264, 267 n.5 (D.C. Cir. 1997).

## A.   *The General Counsel's Case*

[3] The Union challenges the Board's conclusion that the General Counsel failed to present sufficient evidence of anti-union animus to sustain its burden of persuasion. An employer will seldom admit that it was motivated by anti-union animus when it made its adverse employment decision. *See Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466, 470 (9th Cir. 1966) ("Actual motive, a state of mind, being the question, it is seldom that direct evidence will be available that is not also self-serving."). For that reason, circumstantial evidence is sufficient to establish anti-union motive. *See New Breed Leasing Corp. v. NLRB*, 111 F.3d 1460, 1465 (9th Cir. 1997); *see also Folkins v. NLRB*, 500 F.2d 52, 53 (9th Cir. 1974) (per curiam).

"Motive is a question of fact, and the NLRB may rely on both direct and circumstantial evidence to establish an employer's motive, considering such factors as the employer's knowledge of the employee's union activities, the employer's hostility toward the union, and the timing of the employer's action." *Power, Inc. v. NLRB*, 40 F.3d 409, 418 (D.C. Cir. 1994); *see also E.C. Waste, Inc. v. NLRB*, 359 F.3d

36, 42 (1st Cir. 2004) ("To determine motive, the Board may rely on indirect evidence and inferences reasonably drawn from the totality of the circumstances.").

### 1. *Evidence of St. Vincent's Motive*

After carefully reviewing the record as a whole, we conclude that substantial evidence does not support the Board's finding that the General Counsel failed to show that anti-union animus was a motivating factor in St. Vincent's decision to subcontract out the RC department. As discussed below, in the face of strong circumstantial evidence of anti-union animus, the ALJ improperly credited evidence of post-subcontracting improvements in the RC department as a basis for dismissing the General Counsel's case.

[4] Circumstantial evidence of anti-union animus is compelling in this case. First, there is ample evidence that St. Vincent knew about the union activity in the hospital in general, and in the RC department in particular. The head of human resources for the hospital specifically directed hospital managers to monitor all Union activity. Several RC department managers also testified that they identified themselves to Union organizers on various occasions during the second half of 1999 and asked to see Union fliers. Finally, several hospital managers, including the hospital president, testified that they were aware of the impending Union election when the subcontracting decision was made. The testimony of St. Vincent's managers regarding their awareness of the Union's campaign is consistent with the clear evidence that the Union was openly and actively soliciting support in the hospital throughout the second half of 1999.

[5] Second, the inference of anti-union animus raised by the timing of St. Vincent's decision to subcontract is "stunningly obvious." *See NLRB v. Rubin*, 424 F.2d 748, 750 (2d Cir. 1970). As the ALJ found, "[f]rom [St. Vincent's] standpoint the timing of the action could scarcely be imagined as worse."

St. Vincent subcontracted out the department on February 5, 2000, less than a month after the Union filed its petition for an election with the Board, and less than two weeks before the scheduled election. The effect of St. Vincent's decision to outsource operation of the RC department, of course, was the disenfranchisement of twenty-five percent of the employees (ninety-five percent of whom had already expressed their desire to join the Union) who were otherwise eligible to vote in the representation election.

**[6]** Courts have consistently treated an employer's adverse employment action occurring between the filing of a petition for a representation election with the Board and the ensuing election as raising a powerful inference of anti-union animus. *See*, *e.g.*, *E.C. Waste, Inc.*, 359 F.3d at 43 ("[T]he probative value of the timing of the Company's action — firing [an employee] in the critical interval between the time that the Union filed its petition for recognition and the planned representation election — is obvious."); *Joy Recovery Tech. Corp.*, 134 F.3d at 1314 (concluding that "[i]n this case, timing is everything," where "[t]he closing of the department comes on the heels of the union's organizational activity," including filing a petition for a representation election); *Power, Inc.*, 40 F.3d at 418 ("The timing of the layoff, just two weeks before the scheduled union election, gives further credence to the charge of anti-union animus."); *NLRB v. Rain-Ware, Inc.*, 732 F.2d 1349, 1354 (7th Cir. 1984) (concluding that "[t]he timing of the layoffs and warehouse closing provides the strongest support for connecting anti-union sentiment with the layoffs," where the layoffs and warehouse closing closely followed a demand for union recognition). Because St. Vincent subcontracted out its entire RC department less than two weeks before the scheduled union election, the timing of its decision raises an unmistakable inference of anti-union animus.

**[7]** The timing of the decision to subcontract out the work of the RC department is also suspicious because the management problems in the RC department existed for more than a

decade before St. Vincent decided to subcontract out the work of the department. *See Reno Hilton Resorts*, 196 F.3d at 1283 (concluding that "[t]he timing of the decision to contract out is suspect" where it "came on the heels of heavy union activity" and the employer knew of the purported rationale for its subcontracting decision long before it implemented that decision); *see also Joy Recovery Tech. Corp.*, 134 F.3d at 1314-15 (concluding that the timing of the employer's subcontracting decision based on financial concerns was suspicious where it came "on the heels of the union's organizational activity" and employer had maintained the department unprofitably for "a significant period of time"). Even in mid-1999, only a few months before the Union announced that it was close to seeking a representation election, the ALJ found that St. Vincent was in no hurry to remedy the RC department management problems. Indeed, Parente testified that the decision to subcontract was not caused by an emergency in patient care in the RC department. Thus, there was no obvious precipitating event for the subcontracting decision other than the looming union election. In essence, St. Vincent appears to have tolerated its in-house management problems up until the very moment that the Union sought to represent the technical staff at the hospital.

The Board attempts to diminish the strong inference of anti-union animus raised by the timing of St. Vincent's actions. It notes that St. Vincent managers mentioned subcontracting out the work of the RC department in a July 1999 meeting, months before the union election was scheduled.[14] Even so, this is the *same month* that the Union began its organizing drive at the hospital, thereby creating the inference that

---

[14]The Board also argues that there was no direct evidence that St. Vincent management paid particular attention to the Union's November 10, 1999, flier announcing the imminent election. Nevertheless, as discussed earlier, St. Vincent managers paid attention to all of the Union's activities in the hospital. For the reasons discussed above, there is no basis to conclude that the flier, which St. Vincent produced at the hearing before the ALJ pursuant to a subpoena, went unnoticed by St. Vincent management.

Union activity triggered the subcontracting discussion. As discussed earlier, it is undisputed that St. Vincent managers were aware of the Union's activities and that those activities were markedly heightened in July 1999. Thus, the mere fact that St. Vincent managers mentioned subcontracting in July 1999 does little to defeat the inference of anti-union animus. Moreover, the issue was not brought up again until November 18, 1999, *eight days* after the union circulated its November 10, 1999 flier announcing the imminent union election. This sequence of events strengthens, rather than diminishes, the inference of anti-union animus.

After making substantial findings in support of the General Counsel, the ALJ focused part of his analysis on the testimony of St. Vincent's witnesses establishing that after the subcontracting took effect, productivity in the RC department generally improved. Having credited this testimony, the ALJ concluded that the General Counsel failed to carry its burden of persuasion under *Wright Line*.

**[8]** Whether an employer's decision was ultimately good or bad, however, has no relevance in a Section 8(a)(3) case such as this, where the critical issue is the employer's motive. In determining whether an employment decision violates Section 8(a)(3), the "crucial factor is not whether the business reasons cited by [the employer] were good or bad, but whether they were honestly invoked and were, in fact, the cause of the change." *NLRB v. Savoy Laundry*, 327 F.2d 370, 371 (2d Cir. 1964). The ALJ therefore erred in relying on evidence of the RC department's improved conditions to conclude that St. Vincent was not motivated by anti-union animus in its decision to subcontract out the department.

**[9]** In short, the highly suspect timing of St. Vincent's decision to subcontract out the RC department, when coupled with St. Vincent's knowledge of union activity, strongly favored the General Counsel's case. Contrary to the ALJ, we conclude that the probative value of this evidence is not diminished in

any way by the evidence of improved conditions in the RC department after the subcontracting took effect.

However, we turn to the remaining evidence in the record to determine whether the Board's conclusions were supported by substantial evidence on the record as a whole.

### 2.  *Evidence of Pretext*

The ALJ found that "[St. Vincent's] reasons for proceeding as it did seem[ed] to lack plausibility" and that there was a "seeming lack of a clear rationale for the way in which [subcontracting] was carried out." Furthermore, the ALJ found that St. Vincent's asserted reason for subcontracting "[o]n its surface appear[ed] to be a fabrication, and not a very good one at that."

These findings, which we may weigh along with other evidence opposing the Board's ruling, further undermine the Board's conclusion that anti-union animus was not a motivating factor in the subcontracting decision. *See Dash*, 793 F.2d at 1066; *see also NLRB v. Searle Auto Glass, Inc.*, 762 F.2d 769, 773 (9th Cir. 1985). "Where the employer's asserted justification is shifting and unreliable, its case is weakened, and the conclusion that the true reason was for union activity is correspondingly strengthened." *Nevis Indus., Inc.*, 647 F.2d at 910; *see also NLRB v. Dillon Stores*, 643 F.2d 687, 693 (10th Cir. 1981) ("[A] flimsy or unsupported explanation may affirmatively suggest that the employer has seized upon a pretext to mask an anti-union motivation.").

St. Vincent asserted that it subcontracted out the work of its RC department to remedy longstanding management problems. As both Uy and Ramirez testified, they wanted to subcontract out the work of the department to rid themselves of the burden of finding reliable managers. They wanted that burden to fall on an independent contractor. Nevertheless, Ramirez, Hancock, and Weiner each testified that subcon-

tracting out the work of the *RC therapists* was not needed to achieve this result. Ramirez testified that "[t]he transfer of the employees had nothing to do with [California Respiratory Services] getting us a new manager." Weiner also testified that he could have achieved the same results in the RC department without requiring California Respiratory Services to employ the RC employees directly. Hancock, too, testified that he was not aware of any reason requiring St. Vincent to outsource the RC employees in order to get a new manager for the department. As each of these witnesses explained, they were unaware of any reason why subcontracting out the RC therapists would ameliorate the RC department's longstanding *management* problems. Thus, even if there was such a reason, the management of the RC department failed to proffer one.

Several of St. Vincent's witnesses testified that subcontracting out other departments in the hospital had proved successful in the past. On appeal, the Board contends that this evidence of past practice helps to defeat any inference of anti-union animus. Nonetheless, St. Vincent failed to demonstrate *why* those departments were subcontracted, other than vague assertions about "quality issues." Without evidence that the past subcontracting decisions were prompted by the same type of management concerns faced by the RC department, there is no basis to conclude that St. Vincent acted consistently with past practice when it outsourced the work of its RC department.

**[10]** As explained earlier, Parente, the hospital president, testified that outsourcing the RC management while continuing to directly employ the RC employees would create a "divided accountability" problem. But the divided accountability problem was *not* alleviated by the ultimate subcontracting arrangement. Contrary to Parente's justification, RC department managers and employees were not directly employed by the same employer. Total Rehab Care, Weiner's company, hired all the former St. Vincent managers. It then contracted with California Respiratory Services to provide management

services to the RC department. The RC therapists, on the other hand, worked directly for California Respiratory Services. This arrangement did *not* place the RC therapists and the RC department managers in the same organization. Actually, the RC department arrangement would have been identical had St. Vincent simply contracted out its management services to Total Rehab Care. In either case, RC managers and the RC therapists would not have been employed directly by the same employer. Because the divided accountability problem was not addressed by the subcontracting arrangement, Parente's testimony on this point raises the inference that this reason was really a pretext for anti-union animus.

### 3. *Conclusion*

**[11]** We conclude that substantial evidence in the record as a whole does not support the Board's ruling that the General Counsel failed to meet its burden of persuasion under *Wright Line*. We reach this conclusion because (1) the General Counsel presented unrebutted evidence concerning St. Vincent's knowledge of union activity, (2) the timing of St. Vincent's decision to subcontract raised a compelling inference of anti-union animus, (3) the ALJ mistakenly relied on post-subcontracting evidence to establish the cause of the subcontracting decision, and (4) St. Vincent's business justification was unreliable, therefore raising the inference that its justification was merely a pretext for anti-union animus.

We therefore examine St. Vincent's affirmative defense to determine if the Board's ultimate decision in favor of St. Vincent is supported by substantial evidence on the record as a whole.

### B. *St. Vincent's Affirmative Defense*

**[12]** "The pendency of a union representation election does not prevent management from carrying on its business in the normal fashion." *NLRB v. Anchorage Times Pub. Co.*, 637

F.2d 1359, 1366 (9th Cir. 1981). Thus, in a mixed-motive case under *Wright Line*, an employer may avoid a Section 8(a)(3) violation where it can establish that it would have taken the challenged action even in the absence of the protected activity. *See Dash*, 793 F.2d at 1066; *see also Reno-Hilton Resorts*, 196 F.3d at 1284-85; *Wright Line*, 251 N.L.R.B. at 1089.

The Board concluded that St. Vincent established its affirmative defense under *Wright Line*. In sum, the Board concluded that St. Vincent "established that it implemented its subcontracting decision within the 30-to-60 day timeframe it announced prior to the filing of the petition for a representation election." *See St. Vincent Med. Ctr.*, 2003 WL 1785029, at *1 n.4. The Board's simple footnote, however, offers little insight into this otherwise fact-intensive case. *See NLRB v. Special Mine Servs., Inc.*, 11 F.3d 88, 89 (7th Cir. 1993) (discussing the "depressing pattern" of Board decisions in which "[t]here is one serious issue, which the Board tucks into a footnote").

The announcement to which the Board likely refers took place on December 27, 1999. That announcement, however, hardly reflects substantial evidence on the record as a whole that St. Vincent would have subcontracted out the RC department, when and as it did, in the absence of union activity. *See Universal Camera Corp.*, 340 U.S. at 488; *Wright Line*, 251 NLRB at 1089.

**[13]** While St. Vincent adhered to its intended timeline for subcontracting out the work of the RC department, we would need to ignore a powerful string of coincidences to conclude that St. Vincent would have implemented subcontracting, *when and as it did*, in the absence of union activity. First, despite experiencing management problems for more than a decade, St. Vincent first mentioned subcontracting *the same month* that the Union began its full-scale campaign to organize the technical staff. Second, though St. Vincent first dis-

cussed outsourcing in July 1999, it did not decide to investigate subcontractors until *nine days* after the Union circulated a flier at the hospital announcing its intent to seek a representation election. Third, St. Vincent subcontracted the department less than *two weeks* before the scheduled election, thereby disenfranchising one quarter of the eligible voters.

Moreover, as discussed above, the ALJ's findings regarding St. Vincent's purported business justification substantially detract from the Board's conclusion. St. Vincent's witnesses did not present a consistent or plausible explanation for why it was necessary to subcontract out the work of the entire RC department in order to obtain better managers. The ALJ found that St. Vincent's business justification "seem[ed] to lack plausibility," and noted the "seeming lack of a clear rationale for the way in which [the subcontracting decision] was carried out." He further found the justification was "almost too much to believe" and that "[o]n its surface it appear[ed] to be a fabrication, and not a very good one at that." These findings reinforce the inference that the true motive for the subcontracting decision was anti-union animus. *See Nevis Indus., Inc.*, 647 F.2d at 910; *Shattuck Denn Mining Corp.*, 362 F.2d at 470.

**[14]** In light of the record as a whole, we "cannot conscientiously find that the evidence supporting [the Board's] decision is substantial, when viewed in the light that the record in its entirety furnishes." *Universal Camera Corp.*, 340 U.S. at 488.

## CONCLUSION

Because we conclude that the Board's conclusions are not supported by substantial evidence on the record as a whole, we grant the Union's petition for review and remand this case to the Board for further proceedings.

PETITION FOR REVIEW GRANTED.

BEEZER, Circuit Judge, dissenting:

I am unable to join the opinion of the court. Our precedents provide a consistent standard for the review of decisions by the NLRB. Although the correct standards appear in the Court's opinion, a different standard is applied in the evaluation of the record made by the ALJ and NLRB.

I respectfully dissent.

## I

The administrative law judge found that the General Counsel failed to meet his burden under *Wright Line, Inc.,* 251 NLRB 1083 (1980). *Wright Line* requires the General Counsel prove that anti-union animus was a substantial or motivating factor in the decision to subcontract the Respiratory Care Department. The ALJ's finding was affirmed by the National Labor Relations Board. We review the NLRB determination for substantial evidence and accord great deference to the ALJ and NLRB's motive and credibility determinations, as well as any inferences they drew from the evidence. *See New Breed Leasing Corp. v.* NLRB, 111 F.3d 1460, 1464-65 (9th Cir. 1997) ("[T]he [NLRB] is particularly capable of drawing inferences from the facts of a labor dispute" and "the Board is to be accorded special deference in drawing derivative inferences from the evidence") (internal citations omitted); *Retlaw Broadcasting Co. v. NLRB*, 53 F.3d 1002, 1006 (9th Cir. 1995) ("Credibility determinations by the ALJ are given great deference, and are upheld unless they are inherently incredible or patently unreasonable.") (internal citations omitted); *Lippincott Ind., Inc. v. NLRB*, 661 F.2d 112, 116 (9th Cir. 1981) ("[W]e must be mindful that the determination of motive is particularly within the purview of the NLRB.").

## II

St. Vincent presented ample evidence that the Respiratory Care Department was experiencing significant management

and performance problems. Faced with quality problems in other departments, the evidence showed the St. Vincent had successfully alleviated problems by subcontracting out the departments. St. Vincent also presented testimony and evidence that the decision to subcontract the medical services performed by the Department was based, in this instance, on these performance issues and unrelated to an increase in union activity. Our precedent instructs that we "must affirm where the relevant evidence is such that "a reasonable mind might accept [it] as adequate to support a conclusion - even if it is possible to draw a contrary conclusion from the evidence." *Recon Refractory & Construction Inc. v. NLRB*, 424 F.3d 980, 986 (9th Cir. 2005) (internal citation omitted). Ignoring this rule, the opinion of the court discards the ALJ's reasonable finding that the evidence supports a conclusion that St. Vincent was acting in conformity with past practice in an attempt to fix the Department's undisputed management and quality problems in favor of an alternative finding that supports its chosen outcome for the case.

There was no direct evidence of anti-union animus presented by the General Counsel. The entirety of the General Counsel's case was the coincident timing of St. Vincent's decision to subcontract. The ALJ considered this timing sequence and stated that, "I find and conclude that while the evidence is clear that Respondent had ample knowledge of the union activities and sympathies [it] is insufficient to conclude that the 'timing' of the Union's activities here preponderates in favor of the result desired by Counsel for the General Counsel." The ALJ came to this conclusion, not by refusing to consider the suspicious nature of the timing, but by balancing the evidence of the timing of the decision against all other evidence in the record. The ALJ noted that there were no prior charges filed against St. Vincent, no independent violations of Section 8(a)(1) of the Act, and no evidence that St. Vincent treated employees interested in union organizing differently than other employees. Analyzing the evidence as a whole and weighing the asserted justification for subcontracting against

its suspicious timing, and in light of the lack of history of anti-union activity, the ALJ found St. Vincent's justification credible. The ALJ's finding, based on inferences drawn from circumstantial evidence, is to be accorded special deference and cannot be reversed without a finding that the ALJ's inferences were "inherently incredible or patently unreasonable." *New Breed Leasing Corp.*, 111 F.3d at 1464-65.

The opinion of the court gives this finding no deference and simply replaces with its own contrary inference of animus based on the same evidence of suspicious timing noted and rejected by the ALJ and Board. Rather than examine the record as a whole the opinion of the court ignores all evidence in the record favorable to management considered by the ALJ and relies solely on timing to reverse the ALJ and Board's decisions. *See Cal. Pac. Med. Ctr. v. NLRB*, 87 F.3d 304, 307 (9th Cir. 1996) ("[t]he substantial evidence tests requires . . . a review of the whole record"). The precedent created by this finding is that where management's actions coincide temporally with union activity a reasonable fact-finder is compelled to find anti-union animus without regard to other evidence in the record. This holding is contrary to our precedents and contrary to the cases relied upon by the opinion of the court to support its conclusion. *See E.C. Waste, Inc. v. NLRB*, 359 F.3d 36, 41 (9th Cir. 2004) (holding suspicious timing and "myriad violations of § 8(a)(1)" was substantial evidence supporting Board's finding of animus); *Power, Inc. v. NRLB*, 40 F.3d 409, 418 (D.C. Cir. 1994) (holding that coincident timing and uncontested § 8(a)(1) violations was sufficient evidence to support Board's finding). The only evidence in the record beside the timing, St. Vincent's spotless record of working with unions and union organizers, is sufficient to support the ALJ and Board's finding. The opinion of the court's failure to consider this evidence is contrary to Ninth Circuit precedent. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951) (stating that the Act definitively precludes review based solely on select pieces of evidence and

ignoring "evidence from which conflicting inferences could be drawn").

Likewise, the opinion's reliance on *NLRB v. Joy Recovery Tech. Corp.*, 134 F.3d 1307, 1314 (9th Cir. 1998) for the proposition that coincident timing requires a reasonable fact finder to conclude that anti-union animus was a motivating factor, highlights the faulty reasoning of the opinion and its failure to properly apply Ninth Circuit precedent. In *Joy Recovery*, the court noted that the timing of a decision to close a department could be seen either as suspicious, in light of the recent union activity, or a reasonable business decision in light of the department's recent difficulties. The court stated that the timing "supports both sides." *Id.* The opinion of the court's refusal to recognize, in this case, that the timing of the subcontracting decision "supports both sides" where there is evidence of coincident union activity and escalating management problems exemplifies the results oriented analysis employed by the opinion.

Reasonable minds may disagree about whether the concurrent timing of the subcontracting decision and the increased union activity is sufficient evidence that anti-union animus was a substantial factor in the subcontracting decision. I do not agree that ignoring the agency's view of the facts and evidence is an adequate basis for us to reverse the ALJ and NLRB's decision. "A reviewing court may not displace the NLRB's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Retlaw Broadcasting Co.,* 53 F.3d at 1005.