Stanley A. DASH, Jr., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Lawyers Co-operative Publishing Company, Intervenor-Respondent.

No. 85–7267.

United States Court of Appeals, Ninth Circuit.

Argued Feb. 4, 1986.

Submitted April 7, 1986.

Decided July 7, 1986.

Lawton & Cates, Bruce M. Davey, Madison, Wis., for petitioner.

Ellen Boardman, N.L.R.B., Washington, D.C., for respondent.

Eugenia D. Ulterino, Rochester, N.Y., for intervenor-respondent.

On Petition to Review an Order of the National Labor Relations Board.

Before ANDERSON and PREGERSON, Circuit Judges, and SOLOMON,* Senior District Judge.

PREGERSON, Circuit Judge.

Stanley A. Dash, Jr. appeals from a decision and order of the National Labor Rela-

* Honorable Gus J. Solomon, Senior United States District Judge, District of Oregon, Sitting by Designation.

tions Board ("the Board"). The Board found that the Lawyers Co-operative Publishing Company ("LCP") did not violate section 8(a)(1) and (3) of the National Labor Relations Act ("NLRA") by discharging Dash or by appealing to the Wisconsin state court Dash's award of unemployment compensation benefits.[1] Dash contends that the Board's decision, which reversed the decision of the Administrative Law Judge ("ALJ"), is not supported by substantial evidence. We reverse in part and remand.

## BACKGROUND

Dash worked for LCP as a sales representative from November 1971 until his termination on November 5, 1980.

In December 1979, Dash initiated a union organizing drive among LCP's sales representatives. On May 5, 1980, the sales representatives voted against unionization. Later that month, on the advice of a psychologist, Dash, who suffered extreme stress as a result of the organizing campaign, took a leave of absence from work. He did not immediately notify his regional manager, as required by company policy. On May 30, the National Sales Manager sent Dash a telegram threatening him with discharge if he did not report by telephone by June 3. Dash complied with the demand, and the threat of discharge was dropped. As a condition to his return to work, LCP required Dash to submit to a psychiatric examination by a doctor of LCP's choosing. Dash submitted to the examination on September 9, received a clean bill of health, and returned to work on September 22.

On November 4, 1980, Dash had an argument with Michael Santangelo, a customer service supervisor in LCP's home office. Dash admits that he may have sworn at Santangelo. LCP's management listened to Santangelo's version of the argument, but refused to listen to Dash when he tried to tell his version. On November 5, LCP discharged Dash.

Following the discharge, the Wisconsin Department of Industry, Labor and Human Relations (DILHR) awarded Dash unemployment compensation benefits. LCP appealed the award to the Appeal Tribunal of the DILHR (Appeal Tribunal). After a telephone hearing in which LCP presented no witnesses, the examiner of the Appeal Tribunal upheld the award. LCP filed a petition for review with the Wisconsin Labor and Industry Review Commission (Review Commission), which dismissed the petition as untimely. LCP then filed a complaint in the circuit court of Dane County, Wisconsin, asking that the Review Commission's decision be set aside, the examiner's decision reversed, and the proceeding remanded for a de novo hearing before the Appeal Tribunal.[2]

On January 14, 1980, during the course of the union organizing campaign, Dash filed an unfair labor practice charge against LCP in Case No. 30–CA–5603. Dash alleged that LCP had discriminated against him because of his union activity, and that Regional Manager Murrell had threatened his job security during a January 9 meeting because of his "negative attitude toward the company." The complaint, as later amended, alleged that LCP had committed numerous violations during the course of the union organizing campaign. Shortly before the scheduled hearing date, LCP reached a settlement agreement with the union. The Regional Director approved the agreement on October 1. Under the agreement LCP agreed to expunge from Dash's personnel file all references to the January 9 threat of probation and the May 30 threat of termination, and to refrain from considering those

---

1. Although the facts involved in this case occurred in Wisconsin, Dash was a Nevada resident when the present action was filed. This court has jurisdiction to review a Board order when the person aggrieved by the order resides in the circuit. 29 U.S.C. § 160(f).

2. The action was pending when this case was heard by the ALJ. At oral argument, Dash's counsel informed this court that the action has been dismissed, and that Dash has received his benefits.

warnings in evaluating Dash's employment in the future.

On November 12, one week after his termination, Dash filed a second charge against LCP in Case No. 30–CA–6152, alleging that LCP had discriminated against him because of his union activities and because of his testimony in Case No. 30–CA–5603. In particular, Dash alleged that LCP had discriminated against him by (1) threatening him with termination on May 30; (2) delaying his return to work from his medical leave of absence; and (3) discharging him on November 5.

On January 7, 1981, the Regional Director set aside the settlement agreement, stating:

In view of the similarity and interwoven nature of the unfair labor practices in Case No. 30–CA–5603 and those presently alleged in Case No. 30–CA–6152, it appears that [LCP] has failed and refused to comply with all the terms and conditions of the settlement agreement ... and has, in fact, continued to engage in conduct which appears to be not only violative of the [NLRA], but in retaliation for the charges in Case No. 30–CA–5603.

On January 25, the General Counsel issued a complaint, consolidating the charges in Case No. 30–CA–5603 and Case No. 30–CA–6152. The ALJ issued its decision and order on August 19, 1982, concluding that LCP had committed numerous violations of section 8(a)(1) and (3) of the NLRA, 29 U.S.C. § 158(a)(1) and (3). The ALJ found that LCP had subjected Dash to disparate and discriminatory treatment by requiring him to submit to an independent psychiatric examination before returning to work after his leave of absence, by discharging him

for his union activities, and by filing its action in the Wisconsin state court. The ALJ concluded as a matter of law that these activities violated section 8(a)(1) and (3) of the Act. The ALJ ordered LCP to reinstate Dash to his former position, give him back pay with interest, expunge all references to his discharge from its records, withdraw its state court action, and reimburse Dash for legal fees incurred as a result of the state court action.

A three-member panel of the Board, with one member dissenting, reversed the ALJ's finding that LCP had committed an unfair labor practice by discharging Dash.[3] The Board majority found that LCP would have terminated Dash for his abusive behavior toward Santangelo, despite Dash's union activities. The Board unanimously found, contrary to the ALJ's finding, that LCP had not committed an unfair labor practice by filing its action in the Wisconsin state court. The Board refrained from deciding whether LCP had committed an unfair labor practice before executing the settlement agreement by requiring Dash to submit to an independent psychiatric examination before allowing him to return to work from his leave of absence.[4]

Dash filed a timely appeal, challenging the Board's findings that LCP had not committed an unfair labor practice by discharging him or by filing its state court action.[5] Dash contends that the Board's findings are not supported by substantial evidence.

## STANDARD OF REVIEW

We will enforce the Board's order "if the Board has applied the correct legal standard and there is substantial evidence in the record as a whole to support its find-

---

**3.** The Board issued its decision and order on December 7, 1984. The decision is reported at 273 N.L.R.B. No. 31.

**4.** "[A]n unfair labor practice will not be found based on presettlement conduct unless there has been a failure to comply with the settlement agreement, or subsequent unfair labor practices have been committed." *Interstate Paper Supply Co.*, 251 N.L.R.B. 1423, 1424 n. 9 (1980); *see*

*Ann's-Schneider Bakery*, 259 N.L.R.B. 1151, 1152 (1982).

**5.** Dash also mistakenly challenged a purported finding by the Board that LCP had not committed an unfair labor practice by requiring him to submit to an independent psychiatric examination before returning to work from his leave of absence. However, as stated above, the Board made no finding with respect to this issue.

ings and conclusions." *Wakefield v. NLRB*, 779 F.2d 1437, 1438 (9th Cir.1986). Where the Board's findings are *not* supported by substantial evidence, we must set aside the findings and the orders resting on the findings. *NLRB v. Baptist Hospital, Inc.*, 442 U.S. 773, 782, 99 S.Ct. 2598, 2603, 61 L.Ed.2d 251 (1979) (citing Administrative Procedure Act, 5 U.S.C. § 706(2)(E); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Wakefield*, 779 F.2d at 1438.

■ When the Board and the ALJ make contrary findings, we give deference to the Board. We still consider the ALJ's findings, however, and weigh them with other evidence opposing the Board's decision. *NLRB v. Searle Auto Glass, Inc.*, 762 F.2d 769, 773 (9th Cir.1985).

## DISCUSSION

### I. *The Discharge of Dash*

■ Where a discharged employee alleges that his discharge constitutes an unfair labor practice, the General Counsel bears the burden of proving that the employee's exercise of a protected activity was a motivating factor in the termination. As an affirmative defense, the employer may show by a preponderance of the evi-

dence that it would have terminated the employee despite the protected activity. *Searle Auto Glass, Inc.*, 762 F.2d at 773; *Wright Line*, 251 N.L.R.B. 1083, 1089 (1980), *enforced*, *NLRB v. Wright Line, a Division of Wright Line, Inc.*, 662 F.2d 899, 909 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982) (approved in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 403–04, 103 S.Ct. 2469, 2475–76, 76 L.Ed.2d 667 (1983)).

A majority of the Board found that LCP had met its burden. One member, however, found that Dash's union activities were the sole cause for his termination. We find that although the Board applied the correct legal standard, its ultimate findings on this issue are not supported by substantial evidence.[6]

### A. *The Background Evidence*

■ The Board majority found that LCP would have fired Dash following his argument with Santangelo despite Dash's union activities. In reaching this finding, the majority relied on what it termed "extensive background evidence establishing that [LCP] had long considered Dash to be an employee with serious behavioral problems."[7] This "extensive background evidence" consisted of one memorandum regarding Dash's attitude toward his job,[8] two customer complaints,[9] and testimony

---

6. Although the determination of an employer's motive for discharging an employee is "particularly within the purview of the NLRB," *Searle Auto Glass, Inc.*, 762 F.2d at 773 (quoting *Lippincott Industries, Inc. v. NLRB*, 661 F.2d 112, 116 (9th Cir.1981)), we may set aside the Board's determination of motive if we find that it is not supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

7. The majority relied on this evidence only for its relevance to LCP's perception of Dash and its motive for discharging him. The majority refrained from making any factual findings with respect to the truth of the background evidence.

8. This memorandum was written by Sales Manager Irv Kensler, and directed to Personnel Manager Richard Roth. The memorandum referred to Dash's "negative attitude"—which Kensler later testified pertained to territory changes about which Dash was displeased—and his aggressive demeanor with customers.

9. Both customers complained that they felt Dash was overly aggressive. In response to one of these complaints, however, a third customer wrote to praise Dash for his persistence as a salesman. This customer wrote that Dash was "fiercely dedicated to his product" and "aggressively persuasive." Moreover, Kensler conceded, with respect to the other complaint, that it "was only one side of the story."

regarding a meeting between Dash and LCP's personnel manager.[10]

We do not find this background evidence persuasive for several reasons. First, as noted by the ALJ, the evidence shows that any problems with customers or with company personnel caused by Dash's aggressive nature were no different from those caused by the sales force generally. The evidence shows, rather, that customer complaints against salesmen were not unusual, and that LCP condoned aggressive—and even abusive—behavior by its sales representatives provided they were successful in selling law books. Second, the evidence shows that Dash was extraordinarily successful, and enjoyed great popularity among his customers. Finally, we note that at no time did LCP take any steps to discipline Dash before his termination.

Sales Manager Irv Kensler testified that it "was not uncommon" to hear complaints from customers that a salesman had been abusive or aggressive, because "[LCP employs] a bunch of hard hitting aggressive people and they step on toes once in a while." Asked whether, to his knowledge, any salesman had ever been discharged for being abusive or aggressive, Kensler replied emphatically, "No, no. Not if he was selling books." One sales representative testified that in his fifteen years of employment with LCP he had received between fifteen and twenty customer complaints. Yet this salesman was not terminated or disciplined; the only steps that LCP's management ever took in response to these complaints were to discuss the problem with him and suggest ways in which he might improve.

Dash had approximately 600 customers in his area, and made almost 2100 personal contacts with these customers each year. Yet in his nine years of employment with LCP, only two customer complaints were

lodged against him. LCP, moreover, received numerous letters *commending* Dash as an excellent salesman. When Dash was under consideration for the position of regional manager, Anderson received over fifty letters of commendation from Dash's customers, and only one letter of criticism.

As stated above, Kensler testified that LCP would not discharge a salesman for abusive or aggressive behavior as long as he was successful. The evidence shows that Dash was extraordinarily successful. In 1979 Dash won awards for achieving more than 100 percent of his set quota and for having the highest production among sales representatives in his region. Dash also won two prizes in 1979: a trip to Bermuda for being one of LCP's highest overall producers, and a color television for selling more sets of a new bankruptcy publication than any other LCP sales representative. In reaching its conclusion that LCP considered Dash a problem, the Board majority apparently ignored all evidence of Dash's success and popularity as a salesman. There is no discussion of such highly favorable evidence in its decision.

The dissenting Board member noted that LCP had always condoned Dash's activities. LCP never punished or reprimanded Dash for the two customer complaints, nor did it place him on probation after his meeting with Murrell on January 9, 1980. Indeed, even after receiving the two customer complaints, LCP considered Dash for promotion to regional manager.

The Board's reliance on this background evidence—the memorandum regarding Dash's attitude, the two customer complaints, and the meeting between Dash and the personnel manager—is therefore misplaced. The evidence shows that Dash was not a troublemaker, but on the contrary

---

**10.** The personnel manager called this meeting to discuss Dash's Christmas bonus, his sales forecast for 1980, and the friction that had developed between Dash and service correspondents in the home office. The personnel manager told Dash at the outset that LCP was considering putting him on probation, but that the decision would depend on the outcome of the meeting. Dash responded that he wanted to improve, and the threat of probation was dropped. This meeting, coincidentally, occurred on the same day that LCP's top management learned of the union organizing campaign. There is no evidence, however, that LCP knew of the campaign at the time of the meeting.

was one of LCP's top salesmen, and that any rare problem he may have had with customers and home office personnel was of the sort that one might expect from a successful, aggressive salesman. Such problems were not unusual among LCP's sales force.

### B. *The Argument with Santangelo*

On November 4, 1980, Dash had an argument with an employee in LCP's customer service department. The employee reported the incident to her supervisor, Michael Santangelo, who then telephoned Dash. According to Santangelo, Dash immediately began swearing. Dash, however, testified that if he swore at Santangelo, it was only *after* Santangelo threatened to "slow down or reject" any order that Dash sent in to the customer service department.[11] Santangelo admitted telling Dash that if he did not calm down and stop swearing, any order that came into the department without an "i" dotted or a "t" crossed would be rejected.[12]

After the argument, Santangelo bypassed his own superior and went directly to Pete Bissett, the National Sales Manager. Bissett is Dash's superior. As soon as Santangelo mentioned Dash's name, Bissett stopped him and called in Roger Roth, the Personnel Manager. When Roth arrived, Santangelo continued his report of the incident. After hearing Santangelo's version, and without any discussion, Bissett and Roth decided to terminate Dash.[13] Neither Bissett nor Roth, nor any other person at LCP, made any attempt to learn Dash's version of the incident. When Bissett called Dash the following day to tell him he was fired, Bissett refused to listen to Dash's version.

The ALJ found that the sequence of events after Dash's argument with Santangelo indicated that "Dash had been singled out for harassment and for ultimate discharge," and that "LCP was looking for a reason to get rid of Dash and had been looking for a reason for some time." We agree. The evidence shows that there was nothing unusual about Dash's argument with Santangelo. Kensler testified that sales representatives swore at correspondents "all the time." He estimated that there "was probably one person in every region who was forever raising hell with someone in the home office." Yet, to his knowledge, no one had ever been disciplined for swearing. Other testimony supports this assertion. Gregory Talbot, a sales representative, testified that he had heard both salesmen and management use profanity, and that he had heard one salesman, Bob Carduner, curse at several members of LCP's top management. Talbot testified that Carduner was "practically always angry about something or somebody." Yet LCP later promoted Carduner to a management position. David Mann, a regional manager, testified that one of his salesmen had sworn at him, but was not disciplined in any way. And Barry Oliver, a former LCP collection correspondent, testified that he had often heard salesmen use profanity, and that he had used it himself on occasion. Oliver had never heard of anyone at LCP being fired for swearing.

The Board majority did not dispute the ALJ's finding that LCP was motivated to terminate Dash because of his union activities. The majority found, however, that LCP had met its burden of proving that it would have terminated Dash for his conduct toward Santangelo, regardless of his union activities. The evidence simply does not support such a finding. The evidence

---

**11.** According to Dash, Santangelo's exact words were: "You will talk to me or I will rip up, return or lose every order of yours that comes through this department for clearance."

**12.** The ALJ did not consider the sequence of the argument important, because he observed that "swearing at ... customer service [personnel] was not uncommon." The Board concluded that Dash would have been terminated even if

his version of the argument were accepted as true.

**13.** Asked whether Bissett had said anything to Roth after hearing about the incident, Santangelo testified, "Oh, yes. [Roth] looked at [Bissett] and said what do you think we ought to do? [Bissett] said terminate him."

shows, rather, that swearing and abusive or aggressive behavior were commonplace among LCP's sales representatives, and that LCP did not discipline its sales representatives for swearing.

We find LCP's conduct on November 4 and 5 to be highly significant. When Santangelo reported that he had argued with Dash, LCP failed to seek out Dash's version of the incident. It did nothing to verify that an argument had, in fact, occurred. When Dash tried to explain his version of the incident, Bissett refused to listen. Rather than try to ascertain what had really happened, LCP's management took Santangelo at his word, and assumed that Dash was to blame. We agree with the dissenting Board member, who found that LCP's "determination to hear only Santangelo's version established that its interest was in finding a plausible pretext for the discharge, and not in ascertaining what actually occurred."

The Board's finding that LCP would have terminated Dash despite his union activities is not supported by substantial evidence. LCP has thus failed to prove its affirmative defense to the charge of unfair labor practice in terminating Dash. Insofar as it relates to the issue of Dash's termination, therefore, we modify the Board's order to conform with the proposed order of the ALJ, that LCP be required to reinstate Dash to his former position without prejudice to seniority or other rights, give Dash back pay with interest according to law, and expunge from its personnel and other records any reference to the discharge.[14] Thus, we remand to the Board for hearing on the amount of back pay due Dash. *See Wakefield*, 779 F.2d at 1439 (denying enforcement of Board's order and remanding for reassessment of amount of back pay due to discharged employee).

## II. *LCP's State Court Action*

■ The Board may not enjoin the "filing and prosecution of a well-founded law-

suit ... as an unfair labor practice, even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the Act." *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743, 103 S.Ct. 2161, 2170, 76 L.Ed.2d 277 (1983). A well-founded lawsuit is one that has a reasonable basis in fact *or* law. *Id.* at 745-47, 103 S.Ct. at 2171-72. A suit has a reasonable basis in *fact* if it raises "a genuine issue of material fact that turns on the credibility of witnesses or on the proper inferences to be drawn from undisputed facts." *Id.* at 745, 103 S.Ct. at 2171. A suit has a reasonable basis in *law* "if there is any realistic chance that the plaintiff's legal theory might be adopted." *Id.* at 747, 103 S.Ct. at 2172.

The ALJ found that LCP's appeal of the award of unemployment benefits and its state court action were unlawfully motivated, and recommended that LCP be ordered to withdraw its state court action and reimburse Dash for legal expenses incurred as a result of the appeal. The Board, however, found that LCP's state court action had a reasonable basis in both fact and law. The Board found that LCP "reasonably could have contended ... that it was prejudiced by the examiner's refusal" to continue the telephone hearing to allow it to obtain counsel and call witnesses, and by the examiner's reliance, in deciding for Dash, on LCP's failure to call witnesses. These findings are supported by substantial evidence.

LCP alleged that its failure to be represented by counsel at the telephone hearing before the Appeal Tribunal—as well as its failure to call witnesses—was the result of a misunderstanding of the instructions for the telephone hearing. When Dash appeared at the telephone hearing with his attorney, LCP requested an adjournment

---

**14.** This court has jurisdiction to "make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board." National Labor Relations Act § 10(f), 29 U.S.C. § 160(f); *cf.*

*NLRB v. Max Factor and Co.*, 640 F.2d 197, 205 (9th Cir.1980), *cert. denied*, 451 U.S. 983, 101 S.Ct. 2314, 68 L.Ed.2d 840 (1981) (noting that the court has the power to modify the Board's order where it is appropriate to do so).

so that it could obtain counsel. The examiner refused. When the examiner asked LCP if it had any witnesses to call, LCP again requested an adjournment. The examiner again refused. In its decision upholding the award of benefits, the examiner stated that LCP had failed to call witnesses and as a result had failed to meet its burden of presenting evidence regarding the circumstances of Dash's discharge.

The Board found that the telephone hearing instructions presented an issue of material fact, "because they arguably prohibit legal representation and the presentation of witnesses at a telephone hearing." The language of the instructions clearly supports such an interpretation.[15] Furthermore, if such an interpretation had been adopted, LCP might have prevailed in the Wisconsin state court on its due process claim. LCP's state court action therefore had a reasonable basis in both fact and law, and the Board properly refused to enjoin it. *See Bill Johnson's Restaurants*, 461 U.S. at 743, 103 S.Ct. at 2170.

■ Once the Board has determined that an employer's state court action is well-founded, it must stay its proceedings and await the resolution of the state action. *Id.* at 745–46, 103 S.Ct. at 2171–72. If the employer prevails in the state court action, it will also prevail before the Board, because "the filing of a meritorious lawsuit, even for a retaliatory motive, is not an unfair labor practice." *Id.* at 747, 103 S.Ct. at 2172. If, however, the employer does *not* prevail in the state court action, the Board must determine whether the employer filed the suit in retaliation for the employee's exercise of protected rights, and thereby committed an unfair labor practice. *Id.* If the Board finds that the action *was* retaliatory, it may order the employer to

reimburse the employee for attorney's fees and other expenses. *Id.*

Here, the Board did not correctly apply the legal standard set forth in *Bill Johnson's Restaurants*. It did not stay its proceedings pending resolution of the state court action. The Board tried to obviate the need for further proceedings—in the event that LCP lost its state court appeal—by considering LCP's motivation for the appeal. The Board failed, however, expressly to determine "whether the suit had been filed in retaliation for the exercise of [protected] rights." *Id.* We therefore remand to the Board for a determination of this issue.

### III. *The Requirement of an Independent Psychiatric Examination*

■ Dash contends that LCP committed an unfair labor practice by requiring him to submit to an independent psychiatric examination before returning to work. Both parties agree that Dash submitted to the examination before the settlement agreement was executed.[16]

The Board will neither set aside a settlement agreement nor find an unfair labor practice based on presettlement conduct unless it *first* finds either a failure to comply with the settlement agreement or a postsettlement unfair labor practice. *Cambridge Contracting, Inc.*, 259 N.L.R.B. 1374, 1381 (1982) (involving a settlement agreement); *Ann's-Schneider Bakery*, 259 N.L.R.B. 1151, 1152 (1982) (involving presettlement conduct).

■ Relying on this standard and on its finding that LCP had committed no postsettlement violations, the Board declined to decide whether LCP's requirement that Dash submit to an independent psychiatric examination constituted an unfair labor

---

**15.** The instructions read, in pertinent part: "This case has been scheduled for a telephone hearing. Your testimony will be taken and recorded over the telephone.... Immediately notify the Office Manager if you wish to: A. Have witnesses present at the hearing; (Requires personal appearance hearing), B. Be represented by an attorney or another person; (Requires personal appearance hearing).... Personal appearance hearings will be scheduled only upon your request."

**16.** The psychiatric examination was conducted on September 9, 1980. The settlement agreement was signed by LCP and the union on September 15 and 18, respectively, and was approved by the Regional Director on October 1.

practice. The Board considered the requirement "only for the purpose of shedding light on [LCP's] motive for its postsettlement conduct," and concluded that the motive was proper.

As shown above, the evidence does not support the Board's finding that LCP would have terminated Dash despite his union organizing activities. Because we find that LCP *did* commit a postsettlement violation by terminating Dash, we must remand to the Board to determine whether LCP committed a presettlement violation by requiring Dash to submit to a psychiatric examination.

## CONCLUSION

The Board's finding that LCP did not commit a postsettlement unfair labor practice by discharging Dash is not supported by substantial evidence. LCP has thus failed to prove its affirmative defense that it would have terminated Dash despite his union organizing activities. Having found a postsettlement violation, we therefore set aside the settlement agreement, and modify the Board's order to conform with the ALJ's proposed order. Therefore, LCP is ordered to offer Dash full and immediate reinstatement to his former position, without prejudice to seniority or other rights. LCP is further ordered to give Dash back pay with interest according to law, and to expunge from its personnel and other records any reference to the discharge. We remand to the Board for a determination of the amount of back pay due Dash.

The Board's initial finding that LCP's state court action was well-founded is supported by substantial evidence. The Board failed, however, to determine—after the resolution of the state court action—whether the action had been filed in retaliation for Dash's exercise of protected rights. We therefore remand to the Board for a determination of this issue.

Because we find that LCP committed a postsettlement unfair labor practice by discharging Dash, we remand to the Board for a determination whether LCP committed a presettlement unfair labor practice by requiring Dash to submit to a psychiatric examination before returning from his leave of absence.

REVERSED IN PART AND REMANDED. EACH SIDE TO BEAR ITS OWN COSTS.

J. BLAINE ANDERSON, Circuit Judge, dissenting:

I respectfully dissent. This is a classic case for the application of our deferential and narrow standard and scope of review. The majority recognizes our restrictive role but declines to apply it because they are not "persuaded" by the "facts." Fact finding and the inference to be drawn are for the Board, not this court. *See, e.g., Kallmann v. NLRB*, 640 F.2d 1094, 1098 (9th Cir.1981); *Zurn Industries, Inc. v. NLRB*, 680 F.2d 683, 693–94 (9th Cir.1982). The Board relied on significant facts not mentioned in the majority opinion, including, but not limited to, Dash's rather sorry record of rudeness and arrogance.

The interested reader and researcher are directed to the majority and dissenting opinions of the Board members, 273 N.L.R.B. No. 31 (1984), in support of the assertions made in this brief dissent. It is clear that the Board majority accepted an almost undisputed version of facts in reaching its conclusion. The facts so found by the Board are supported by the record and constitute substantial evidence on the record as a whole. In the interests of uniformity, stability and predictability, we must not substitute our judgment just for a preferred result.

We are obligated to deny the petition for review and I would do so.