In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1423

ROBERTHENRY DAVIS, SR.,

*Plaintiff-Appellant,*

*v.*

TIME WARNER CABLE OF
SOUTHEASTERN WISCONSIN, L.P.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 08 C 0652—**Lynn Adelman**, *Judge.*

ARGUED SEPTEMBER 30, 2010—DECIDED JULY 5, 2011

Before FLAUM, MANION, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Roberthenry Davis, Sr., an African American salesperson, was fired from Time Warner Cable of Southeastern Wisconsin ("Time Warner") after his white boss concluded that Davis violated Time Warner's zero-tolerance Employee Guidelines by processing a noncommissionable transaction as a commissionable one. Davis complained about his termi-

nation to Time Warner's human resources department and was ultimately reinstated after the customer whose transaction Davis allegedly botched clarified the type of service he had requested. Shortly after Davis returned to work, Time Warner made changes to its compensation scheme that Davis believed adversely affected his future earnings potential. Believing that both his termination and the new compensation scheme were racially or vindictively motivated, Davis sued Time Warner under 42 U.S.C. § 1981(a) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Time Warner and Davis cross-moved for summary judgment. The district court granted Time Warner's motion and denied Davis's. Davis appeals, and we affirm.

## I. Background

Davis is a member of Time Warner's "inside sales team," a small group of salespeople that fields telephone calls from current and prospective subscribers to Time Warner's Business Class services. Members of the inside sales team are required to meet monthly sales quotas and are paid per-transaction commissions to complement their modest base salaries, but they are not responsible for soliciting new corporate clients or managing complex customer accounts. Those duties fall to the "outside sales team," a larger group of salespeople whose members earn higher base salaries. At times relevant to this case, the inside sales team was composed mostly of African American salespeople, and the outside sales team was composed mostly, and at times exclusively, of white salespeople.

### A.  Events Prior to Davis's Termination

In November 2003, Time Warner brought in a new Director of Business Class Sales, a white man named Ron Cleboski. Davis contends that Cleboski, who terminated him some three years later, did so because he was biased against Davis and other African Americans. Davis highlights as background evidence,[1] *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), various incidents in which Cleboski's alleged "phobia" of African Americans manifested itself. These incidents occurred sporadically over a three-year span and included Cleboski displaying "motivational" signs bearing the tagline "Clebonics," which Davis perceived as an offensive amalgam of "Cleboski" and "Ebonics"; commenting that an African American's telephone demeanor was "too urban"; and telling a different African American salesperson, Ron Coleman, that he was "not management material."

---

[1] Though Davis offers a lengthy description of these events in his opening brief, he fails to articulate a ground for relief, such as a hostile work environment claim, which could directly redress any injury he may have incurred from them. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002). The district court recognized that Davis might have been trying to make stronger use of this evidence by attempting to assert a hostile work environment claim, *see Davis v. Time Warner Cable of Se. Wis., L.P.*, No. 08-C-0652, 2010 WL 322748, at *3 (E.D. Wis. Jan. 20, 2010), but because he has failed to develop such a claim in his brief, we find it waived, *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841 (7th Cir. 2009).

In early 2005, two women joined the inside sales team. Victoria Rodgers, who is African American, took to her job quickly and meshed well with Davis and Coleman, the lead inside salesperson.[2] Mary Schmitt, who is white, had more trouble learning Time Warner's computer system, keeping her sales numbers up, and getting along with her colleagues. Coleman, Rodgers, and Davis, who consistently exceeded their sales quotas by wide margins (they regularly earned six figures despite having base salaries of $20,000 or $30,000[3]), felt that Schmitt's lackluster performance was holding the team back and complained to management about her. Schmitt in turn blamed her poor performance on the others' failure to train her properly and lodged her own complaints with management. Coleman testified that the atmosphere in the inside team's small workspace was "tense," while Schmitt stated in her affidavit that she sometimes "felt like a lamb in the middle of a wolf pack." John Woodrum, a human resources director, testified that the inside team was "dysfunctional," and Rodgers reported that "[t]here was a personality conflict between all four of us."

---

[2] Coleman was the longest-serving member of the team and therefore acted as the team "lead," a role which conferred occasional responsibilities but no formal supervisory authority.

[3] Davis repeatedly asserts that the base salary for inside salespeople was $20,000, but the copy of his 2006 compensation contract in the record indicates that he was paid a base salary of $30,000. Either way, there is no dispute that the three African American inside salespeople consistently earned significantly more than the base salary.

The inside sales team's interpersonal problems became fodder for Time Warner's rumor mill. In early September 2006, Cleboski heard through the grapevine that some Time Warner employees believed that Coleman, Rodgers, and Davis were treating Schmitt poorly while Cleboski looked the other way. Cleboski and Jim Fraser, who directly managed the inside team, called a meeting of the team to discuss the rumors. Davis testified that during that meeting, Cleboski characterized the rumors as, "I'm being told that . . . I'm allowing my blacks to get away with murder." Fraser and Cleboski emphasized the importance of teamwork and attempted to promote a cohesive team atmosphere by offering the inside sales team a monetary prize if they were able to work together to achieve a team sales goal.[4] Fraser and Cleboski then left the room to encourage the inside team members to talk through their conflicts. This attempt failed; Schmitt left the meeting before anything constructive could be accomplished.

Coleman, Rodgers, and Davis jointly sought out Fraser and Cleboski for further discussion after Schmitt left. According to Davis, "[w]e basically expressed our concern with the way that we were being portrayed as ostracizing Ms. Schmitt, not helping her . . . we voiced our concern that, you know, from the very beginning we were singled out as the reason for her failures and that, you know, we didn't appreciate that." Cleboski

---

[4] The team did not earn the prize because of a shortfall in Schmitt's sales.

responded by explaining that the underlying goal of the meeting was to foster better teamwork; instructing Coleman, Rodgers, and Davis to be more patient with Schmitt; and cautioning that he would be forced to resort to disciplinary action if the problems continued.

During an individual meeting the next day, Coleman told Cleboski that he believed Cleboski's handling of the rumors was "unfair." Davis also met with Cleboski individually at some point within the next few days. He told Cleboski that he too believed that he, Coleman, and Rodgers had been treated "unfairly." Davis also told Cleboski that he believed the African American inside salespeople were "being treated less favorably than our white counterparts." He gave as examples: "Our white counterparts were allowed to sell to our accounts. . . . [O]ur white counterparts were allowed to demean us by calling us order takers and referencing us as not being salespeople. Us being blamed for the lack of success for our lone white counterpart." Davis told Cleboski that he blamed Cleboski for the perceived differential treatment.

Davis's "white counterparts" included Schmitt and most (or all) of the outside sales team. There was longstanding hostility between the inside and outside teams, apparently due to the outside sales team's resentment of the large commissions the inside sales team earned without shouldering the responsibilities of cold-calling. Despite management's efforts to defuse the tension— Davis alleges that the inside team was instructed not to celebrate its success in front of the outside team, and that in November or December 2006 management put

the issue of "outside representative recognition" on the agenda for a meeting of the entire sales staff—the teams occasionally squabbled. In or about September 2006, a dispute erupted between Rodgers and a white member of the outside sales team. Coleman brought the dispute to Cleboski's attention, which prompted Cleboski to comment to Coleman that "his team of African Americans kept getting him into trouble." Davis did not learn of this comment until several months later.

### B. Events Surrounding Davis's Termination

In late September 2006, after the meetings about the rumors and Davis's individual meeting with Cleboski, Rodgers took a call from a customer who wanted to move his cable connection from one spot in his building to another. Rodgers concluded that the customer wanted a "relocate" rather than a "transfer"—the former is a noncommissonable service request that gets referred to a different department, while the latter is a commissionable transaction handled by the inside sales team. She therefore sent the call to the billing department. For some reason, the call came back to the inside sales team and Davis answered the phone. Davis spoke with the customer, concluded that he wanted a "transfer," and proceeded to initiate a new service agreement with a special promotional rate for the customer. Davis logged a $25 commission in the process. When the customer's manager learned about the sales agreement later that day or the next day, he called back to inquire about the necessity of the new agreement. Davis put the manager

on speaker phone, and Rodgers and Coleman both questioned Davis as to whether the customer really needed a "transfer" and new service agreement. Davis maintained that the transaction was a "transfer" and sent the service agreement off for processing.

The contested service agreement made its way to the desk of Cheryle Parker, who processed agreements and arranged for technicians to complete the requested services. Parker reviewed the agreement and concluded that the transaction should have been handled as a noncommissionable "relocate." She also questioned the applicability of the promotional rate Davis gave the customer. Parker expressed her concerns to management.

Cleboski responded by asking Rodgers and Coleman about the incident, and they explained that they had questioned Davis's characterization of the transaction. Cleboski then telephoned the customer and concluded from that discussion that the customer wanted a "relocate" and not a "transfer." Cleboski also discussed the incident with at least two other managers, Fraser and Dan Conrad, his superior and vice president of the Business Class service team. The managers agreed that Davis had violated Time Warner's Employee Guidelines and should accordingly be terminated.

Before he could terminate Davis, Cleboski had to get approval from a human resources manager, Dionne Archie. Cleboski relayed his version of events to Archie. Archie agreed that Davis's handling of the transaction violated Time Warner's Employee Guidelines, which deem insubordination and "[f]alsification of . . . business-

related documents" misconduct for which "employment may be terminated at any time without a prior warning." Cleboski then prepared a termination notice for Davis, which Archie reviewed and approved. The termination notice stated that Davis had violated Time Warner's insubordination and falsification Employee Guidelines. It explained, "Based on the deception of a customer sale to gain a commission after you were instructed not to do so is grounds for termination." The termination notice also included a section entitled "[p]rior disciplinary action," even though Davis's file at worst contained only short notes and no formal corrective actions.

Parker testified that before Cleboski gave Davis the notice, she saw Cleboski wave a sheaf of papers and heard him say excitedly, "I got him now. It's not the first time, he's done it before and I've got documentation." When Cleboski, accompanied by Fraser, presented Davis with the notice, Davis disputed the accusations against him and refused to sign the termination notice. Security guards escorted Davis from the building. Because of his departure, he was unable to apply for an open managerial position he had planned to seek.

### C. Events Surrounding Davis's Reinstatement

About a week after his termination, Davis telephoned Archie and arranged a meeting to voice concerns about his termination. After speaking with Davis, Archie decided further investigation was warranted. Archie interviewed several people about the transaction and termination, including the customer. (She also investigated

Davis's allegations about Cleboski's "getting away with murder" comment.) Archie concluded that the facts were not as clear-cut as she once thought and that Davis should be "given the benefit of the doubt since he has been a stellar performer in the department." Archie recommended that Davis be reinstated immediately, with back pay, but subject to a written warning and a performance improvement plan. John Woodrum, Archie's superior, reviewed her report and continued the investigation by interviewing some people she had not, including Cleboski. After he completed his investigation, Woodrum remained convinced that Davis had been properly terminated. But after the customer weighed in a final time with a story supporting Davis's position, the vice president of human resources over-ruled Woodrum and decided it would be best to reinstate Davis with back pay, including projected commissions and some bonuses.

Davis returned to his position on November 2, 2006. He was greeted by Kevin Mahlberg, a white former member of the outside sales team who had been promoted to the managerial position Davis had wanted to apply for before his termination. Mahlberg gave Davis a performance improvement plan, which Davis signed under protest. Davis then went to Mahlberg's office, where Cleboski, in a defensive tone, told him something to the effect of, "Despite what you think or what you believe, or whatever, you know, there was nothing personal with your termination." Cleboski then escorted Davis around the Business Class workspace and explained to the inside and outside sales teams that

Davis was "back with us after being out on an extended leave." Davis said that he was "demotivated" by this welcome, which was not as warm as another he recalled. He still managed to meet his sales quotas, however, notwithstanding the tepid welcome and the division of his customers among Rodgers, Coleman, and Schmitt.

Sometime shortly after Davis's return, Time Warner developed a new compensation plan for the Business Class sales teams that was to take effect in 2007. (Neither Davis nor Time Warner has provided us with a copy of the plan or given any clear indication of when it was developed, distributed, or put into effect.) According to Davis, in whose favor we view the record, the new plan increased the inside team's sales quotas and shifted to the outside team some commissionable transactions that had been previously handled by the inside team. These changes allegedly reduced the potential commissions available to Davis and the rest of the inside sales team while raising the potential compensation for the outside team. Davis was highly dissatisfied with the plan, the terms of which no one was given the opportunity to negotiate.

### D. Discrimination Complaints & District Court Proceedings

In February 2007, Davis filed complaints with the Equal Rights Division of the Wisconsin Department of Workforce Development and the federal Equal Employment Opportunity Commission ("EEOC"). He alleged that Time Warner discriminated against him on the basis

of his race and retaliated against him because of his comments to Cleboski about the rumors. Davis later filed a second complaint with the EEOC. The EEOC issued Davis right-to-sue letters in May 2008.

In July 2008, Davis filed suit against Time Warner in the Eastern District of Wisconsin. He alleged that Time Warner racially discriminated or retaliated against him when it fired him and when it changed the compensation plan upon his return, in violation of 42 U.S.C. §§ 1981 & 2000e, and sought a variety of relief, including punitive damages, reinstatement of the previous compensation plan, and managerial training. We assume *arguendo* that Davis's EEOC filings, some of which are absent from the record, contained his Title VII claims; Time Warner has not argued otherwise. *See Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003) ("Generally, a plaintiff may not bring claims under Title VII that were not originally included in the charges made to the EEOC.").

Davis and Time Warner cross-moved for summary judgment on Davis's claims. The district court concluded that there was no evidence that race was a motivating factor in Davis's termination or the changes made to the compensation plan. The district court was unable to discern whether Davis was alleging retaliation or hostile work environment claims. *See Davis*, 2010 WL 322748, at *3 ("[H]e does not develop coherent arguments in connection with either."). "For the sake of completeness," *id.*, it considered whether he had amassed adequate evidence to warrant a trial on those claims.

The district court concluded that he had not and granted summary judgment in Time Warner's favor. The district court denied Davis's cross-motion for summary judgment and his pending motion to strike on the merits, and denied as moot three other nondispositive motions.

## II. Discussion

We review the district court's decision on cross-motions for summary judgment de novo, construing all facts and drawing all reasonable inferences in favor of Davis, the party against whom summary judgment was granted. *Gross v. PPG Indus., Inc.*, 636 F.3d 884, 888 (7th Cir. 2011). Summary judgment is appropriate where the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) & (c).

Title VII of the Civil Rights Act of 1964 prohibits employers, *see* 42 U.S.C. § 2000e(b), from discriminating against their employees based on race, *see* 42 U.S.C. §§ 2000e-2(a)(1). Title VII also prohibits retaliation, or discrimination against an employee "because he has opposed any practice made an unlawful practice by this subchapter. . . ." 42 U.S.C. § 2000e-3(a). Section 1981 prohibits racial discrimination and retaliation against employees when a contractual relationship exists between the employer and employee. *See Thompson v. Mem. Hosp. of Carbondale*, 625 F.3d 394, 402-03 (7th Cir. 2010); *Hobbs v. City of Chi.*, 573 F.3d 454, 460 (7th Cir. 2009).

Though the statutes differ in the types of discrimination they proscribe, "the methods of proof and elements of the case are essentially identical." *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009) (quotation omitted).

Davis contends that Time Warner violated these provisions when it fired him and changed the compensation plan after reinstating him. He claims that Time Warner fired him either (or both) because of the complaints he made to Cleboski or his race, and that it changed its compensation plan for one or both of those reasons as well. This means Davis presents a total of four claims: discriminatory firing, retaliatory firing, discriminatory compensation, and retaliatory compensation. We address them in turn.

## A. Termination Claims

### 1. Discrimination

Davis alleges that he was terminated not because of his handling of the transaction but because of his race. To avoid summary judgment on this claim, Davis, who has elected to proceed only under the direct method, must demonstrate a triable issue as to whether discrimination motivated the adverse employment action[5] of which he complains. *Nagle v. Vill. of Calumet Park*, 554 F.3d

---

[5] Davis's reinstatement does not negate the fact that his termination constituted an adverse employment action. *See Phelan v. Cook County*, 463 F.3d 773, 780-81 (7th Cir. 2006).

1106, 1114 (7th Cir. 2009). Despite his use of the "direct method," Davis need not present direct evidence, such as an admission of discrimination, to survive summary judgment; he may "establish[ ] a discriminatory motive on the part of the employer through a longer chain of inferences." *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir. 2010). We have also described such an inferential chain as "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011) (quotation omitted). Whether deemed a chain or mosaic, the assembled evidence must point "directly to a discriminatory reason for the employer's action" for Davis's claim to survive summary judgment. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

We agree with the district court that Davis's evidence fails to forge the requisite path. This is not, as Time Warner seems to believe, because he relies heavily on "bits and pieces [of evidence] from which an inference of discriminatory intent might be drawn," *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994); that sort of evidence is one of the three primary types generally employed in this sort of case, *Silverman*, 637 F.3d at 734. Nor is it because his briefing amounts to little more than a bombastically worded laundry list of perceived wrongs. It is because Davis has not demonstrated "a real link between the bigotry and an adverse employment action." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001).

There is some evidence in the record indicating that Cleboski was at best insensitive and at worst a bigot. Chief among this are the "Clebonics" signs and his inappropriate characterization of the rumors. But while these occasional incidents demonstrate that Cleboski could be boorish and tactless, Davis has not shown how, if at all, they are linked to his termination. *See Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) ("Isolated comments that are no more than stray remarks in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus."). Davis theorizes that Cleboski fired him in an effort to stop the rumors, but he has not presented any evidence that the rumors continued at the time of his termination or that Cleboski—or any of the six other individuals he consulted—was motivated by anything other than a genuine belief that Davis flouted Time Warner's stringent Employee Guidelines. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008).

Davis attempts to get around his lack of proof by pointing to Cleboski's comment to Parker ("I got him now"), which he claims was not only a "flagrant and slanderous lie" but also "compelling evidence that . . . Cleboski had attempted to set-up and frame" him. While we must infer that Cleboski was referring to Davis when he used the undefined pronoun "him," we fail to see how the statement implicates Davis's race or demonstrates any type of set-up. If anything, it shows the opposite—that Cleboski had suspected Davis of overstepping the bounds set forth in the Guidelines but had been unwilling to take disciplinary action until

presented with evidence of a transgression. Indeed, Davis repeatedly emphasizes both the lack of prior disciplinary action against him and his prowess in earning commissions.

Davis attempts to analogize his case to *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 407 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008), wherein we concluded there was sufficient circumstantial evidence from which a jury could conclude that plaintiff Humphries' employer had set him up. *Humphries* is distinguishable, however. In that case, there was some dispute that Humphries had engaged in the activity for which he was terminated—the only evidence implicating Humphries was testimony from the very coworker about whom he had lodged a discrimination complaint; a different coworker had observed the manager acting differently toward Humphries and believed he was "up to something"; the manager conducted absolutely no investigation before firing Humphries; and there was no evidence that the employer fired anyone else for similar missteps. Most of those factors are absent here. There is no dispute that Davis engaged in the transaction—the issue was whether he did so properly; Cleboski interviewed numerous people, including the presumably impartial customer, a human resources specialist, and his own superior, to ensure he had an accurate understanding of the transaction and that termination was an appropriate course of action; and there is ample evidence in the record indicating that Time Warner strictly enforced its Employee Guidelines and fired at least fifteen people, seven of whom were white, for similar transgressions during a two-year period around Davis's firing.

These facts also distinguish this case from *Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416 (7th Cir. 2004), in which an African American employee who filed a discrimination claim found himself bombarded by nearly three dozen memoranda nitpicking every aspect of his work, unprecedented demands that he file daily reports, and repeated baseless allegations that he was shirking his duties. Even though Time Warner ultimately changed course on Davis's termination, there is no indication that it was "setting him up to fail by enforcing department policies against him in an unreasonable manner," or "holding him to unrealistic standards." *Id.* at 420. Davis's African American coworkers questioned his handling of the transaction and testified that Time Warner had a "zero-tolerance" approach to violations of its customer service Employee Guidelines, which provided that a single violation could result in termination of employment "at any time without a prior warning." The standards were clear and there is no evidence that Time Warner interpreted or applied them differently based on employees' races.

Davis further claims that he, like Humphries and the plaintiff in *Dash v. N.L.R.B.*, 793 F.2d 1062, 1069 (9th Cir. 1986), was denied an opportunity to "defend his innocence," but there is no evidence that Time Warner purposefully turned a deaf ear to him, *see Dash*, 793 F.2d at 1069, or failed to investigate the incident altogether, *Humphries*, 474 F.3d at 407. Cleboski did not interview Davis during the course of his pre-termination investigation, but that omission alone does not support an inference of racial bias or an invidious set-up, *cf.*

*Humphries*, 474 F.3d at 407 ("This is not to say that merely pointing to an employer's shoddy investigatory efforts is sufficient to establish pretext."), particularly in the absence of evidence showing that Cleboski's investigation was not in compliance with Time Warner's standard procedure.

No reasonable jury could conclude that Cleboski set up or terminated Davis because of his race. We affirm the district court's grant of summary judgment on this claim.

## 2. Retaliation

In the alternative, Davis contends that he was fired in retaliation for private comments he made to Cleboski. During a private meeting, Davis accused Cleboski of being "unfair" and treating his white subordinates more favorably than his African American ones. Davis argues that Cleboski was angry about the comments and got back at him by terminating him on baseless grounds.

Such retaliation is prohibited by both Title VII and § 1981. *See, e.g., Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Davis seeks to prove that Time Warner violated either or both of these provisions by way of the direct method. In the retaliation context, this means that Davis has to show three things to survive summary judgment: (1) that he engaged in an activity protected by one or both of those statutes, (2) that he suffered a materially adverse employment action, and (3) that the protected activity is causally related to the adverse employment action. *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010).

Time Warner makes only a half-hearted effort to dispute that Davis's informal comments to Cleboski are within the scope of protected activity. That is wise, as we have held that "an informal complaint may constitute protected activity for purposes of retaliation claims." *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). Davis's complaints to his supervisor here were much more direct than the query, "Aren't you being discriminatory?" that we deemed protected in *Casna*. *See id.* at 426-27. We thus conclude that Davis's comments to Cleboski are "protected activity" for the purposes of Title VII and § 1981. Time Warner does not dispute that termination from one's job, even if later overturned, is a materially adverse employment action. *See Phelan*, 463 F.3d at 780-81. That leaves us with only one question: Has Davis produced sufficient evidence from which a reasonable jury could infer that his complaints to Cleboski were causally connected to his termination?

As with Davis's discriminatory termination claim, we answer that question in the negative. In addition to rehashing verbatim the arguments we rejected above, Davis emphasizes that he was fired within days—there is some discrepancy as to how many, but somewhere between three and about fourteen—of lodging his complaints. As he correctly observes, "the timing of events 'is often an important evidentiary ally of the plaintiff.'" *Lang*, 361 F.3d at 419 (quoting *Lalvani v. Cook Cnty.*, 269 F.3d 785, 790 (7th Cir. 2001)). Indeed, we have recently reiterated that "[o]ccasionally, . . . an adverse action comes so close on the heels of a protected act that an inference of causation is sensible." *Loudermilk v. Best Pallet Co.*, 636

F.3d 312, 315 (7th Cir. 2011). But "ally" does not mean "panacea." We have also cautioned that "[s]uspicious timing may be just that—suspicious," and underscored the importance of context in assessing whether an inference of causality is warranted or not. *Id.*; *see also Silverman*, 637 F.3d at 736 ("Mere temporal proximity is not enough to establish a genuine issue of material fact." (quotation omitted)).

The context here does not justify such an inference. Davis urges us to treat this case like *Loudermilk*, where the plaintiff was fired immediately after handing his supervisor a written complaint, *see* 636 F.3d at 314, or *Lang*, where the plaintiff's supervisors inexplicably found fault with every aspect of his work performance after he lodged a discrimination complaint, *see* 361 F.3d at 420, or *Humphries*, 474 F.3d at 407, and *Dash*, 793 F.2d at 1068, where complaining plaintiffs were swiftly discharged without any investigation after allegedly engaging in minor infractions for which no one was generally disciplined. These comparisons are apt only if we close our eyes to the other facts of this case. In asserting that the proximity of events here similarly implies causation, Davis completely ignores the elephant in the room: the questionable transaction in which he engaged. Uncontroverted evidence in the record shows that Time Warner regularly dismissed employees of all races when it had reasonable cause to believe they had violated its Employee Guidelines. Even though Time Warner ultimately reversed course in this case, the fact remains that there was a significant intervening event separating Davis's complaints from his discharge. *See*

*Hall v. Bodine Elec. Co.*, 276 F.3d 345, 359 (7th Cir. 2002) ("[A]n employee's complaint of harassment does not immunize [him] from being subsequently disciplined or terminated for inappropriate workplace behavior."). Such an event was absent from the cases on which Davis relies.

Moreover, although Cleboski was the common denominator between Davis's complaints and his termination, at least three other Time Warner managers—Fraser, Conrad, and Archie—signed off on the termination after Cleboski relayed to them the findings of his investigation, which involved consultations with other employees who had lodged virtually identical informal complaints. The mere fact Davis's complaints closely preceded his termination is not enough to make this case analogous to others in which no investigation occurred, or where the challenged supervisor (or employee about whom the complaint was made) was the only party involved. Time may be on Davis's side, but no reasonable jury could cross the evidentiary chasm separating Davis's protected activity from his termination without more than he has presented here.

### B. Compensation Plan

### 1. Discrimination

Davis's next contention is that the new compensation plan Time Warner implemented sometime around his return was racially discriminatory, as was Time Warner's refusal to allow negotiation of the plan's terms. He con-

tends that Cleboski masterminded the plan, which shifted some commissionable responsibilities from the inside sales team to the outside sales team, thereby negatively impacting his potential earnings and those of the other African Americans on the inside sales team while increasing the potential earnings of the mostly white outside sales team. Davis asserts that he and his African American coworkers "could see that the plan would severely reduce their possible commissions and they would lose at least 30% . . . of their future income," while Schmitt would be relatively unaffected in light of her lower sales.

It is not entirely clear from Davis's rambling appellate briefing whether he is asserting a disparate treatment claim, a disparate impact claim, or both. (Both are cognizable under Title VII. *See Lewis v. City of Chi., Ill.*, 130 S. Ct. 2191, 2197 (2010).) In his summary judgment brief before the district court, however, Davis unambiguously identified his contention as a "disparate treatment wage claim." Dist. Ct. Dkt. 39 at 13. We confine our analysis accordingly. *See, e.g.*, *Brown v. Auto. Components Holdings, LLC*, 622 F.3d 685, 691 (7th Cir. 2010).

As with his termination-related disparate treatment claim, Davis may proceed past the summary judgment stage only if he presents evidence from which a rational trier of fact could reasonably infer that Time Warner reduced his compensation (undoubtedly a materially adverse action, *see Herrneiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002)) and denied him the opportunity to negotiate the terms of the plan because of

his race. In addition to the evidence of racial animus associated with his termination, Davis points us to Cleboski's involvement with the plan and Time Warner's reliance on unspecified "marketing and budgetary concerns" as the reason for the changes as evidence of Time Warner's discriminatory intent.

We fail to see how a rational jury could infer from this evidence that the compensation plan was enacted for discriminatory reasons. The plan applied to all current and future members of the inside sales team, including Schmitt, who is white. Davis dismisses this as "collateral damage," but it would strain credulity to conclude that Time Warner consciously enacted a discriminatory plan—either to halt rumors or simply to disfavor African Americans—only to apply it even-handedly to all current and future members of the inside sales team. (This is where a developed disparate impact claim might have been able to help Davis.) Moreover, Coleman testified that inside salespeople had the opportunity to switch to the outside sales team—which, according to Davis, received huge pay increases as a result of the compensation plan. (Rodgers and Schmitt both eventually made the switch.) It would be wholly inconsistent to intentionally discriminate while simultaneously giving the alleged targets of the discrimination an unfettered option to remove themselves from the situation.

We reach the same conclusion with respect to Time Warner's refusal to permit negotiations as to the terms of the plan, inasmuch as that may be considered a materi-

ally adverse employment action. Davis has presented testimony indicating that negotiations were allowed in 2004, 2005, and 2006. (Time Warner disputes this.) This evidence does little for his claim of racial discrimination: the composition of the inside sales team had been constant since early 2005, when negotiations were ostensibly permitted. And, like the changes to the compensation plan, the negotiations ban was equally applicable to all members of the inside sales team.

A rational jury could not conclude from the evidence in the record that the compensation plan or its take-it-or-leave-it nature was motivated by discriminatory intent. We affirm the grant of summary judgment on these issues.

## 2. Retaliation

Davis's final contention is that Time Warner adjusted its compensation plan and otherwise adversely changed his working conditions to retaliate against him after he complained to Cleboski and the EEOC about workplace discrimination. As to the latter, he points mainly to the "hostile" performance improvement plan he was forced to sign.[6]

---

[6] Davis also contends that Time Warner's lack of "glee" upon his reinstatement and Cleboski's extension of a deadline so that Rodgers rather than he would be victorious in a sales contest likewise constitute materially adverse employment actions. Davis failed to make these contentions below, however, so they are waived here. *See Ellis v. CCA of Tenn. LLC*, ___

(continued...)

Davis once more relies exclusively on the direct method. As we noted earlier, that means that Davis can overcome summary judgment on a retaliation claim only by making a tripartite showing: (1) that he engaged in statutorily protected activity, (2) that he suffered a materially adverse employment action, and (3) that the protected activity is causally related to the adverse employment action. *Jones,* 613 F.3d at 671.

There is no real dispute that Davis's EEOC filings, *see Silverman*, 637 F.3d at 740, and informal comments to Cleboski constitute protected activity, *see Casna*, 574 F.3d at 427. It is similarly uncontested that a reduction in compensation is a materially adverse employment action. *See Herrnreiter*, 315 F.3d at 744. Time Warner contends that the performance improvement plan does not amount to an adverse employment action, and we agree. "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Oest v. Ill. Dep't of Corr.,* 240 F.3d 605, 613 (7th Cir. 2001). Performance improvement plans, particularly minimally onerous ones like that here, are not, without more, adverse employment actions. *See Cole v. Illinois*, 562 F.3d 812, 816-17 (7th Cir. 2009); *Oest*, 240 F.3d at 613 ("[J]ob-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship."). That leaves us with only

---

[6] (...continued)
F.3d ___, No. 10-2768, 2011 WL 2247384, at *7 (7th Cir. June 9, 2011).

one adverse action to consider: the changes to the compensation plan.[7]

Davis contends that the changes can be traced to his complaints of discrimination. We do not believe a reasonable jury could reach the same conclusion on the evidence in this record. The compensation plan was developed and implemented around the same time that Davis lodged his complaints, but correlation is not the equivalent of causation. Undisputed record evidence shows that Time Warner changed its compensation plan annually, and Davis happened to file his claims around the time of year in which the changes were generally made. Without some evidence linking the complaint(s)—the date on which the second EEOC complaint was filed is absent from the record—to the compensation plan, a rational jury would be hard-pressed to connect the two. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008). Its struggle would be made even more challenging by the fact that the compensation plan applied to the entirety of the inside sales team, even those who did not express any complaints of discrimination. Additionally, to the extent that Davis relies on his informal complaint to Cleboski, he has not demonstrated that anyone involved with the creation of the compensation plan other than Cleboski was aware that any such complaint had been made. *See*

---

[7] Davis does not develop a contention that Time Warner's refusal to allow negotiation of the terms of the compensation plan was retaliatory in nature.

*Durkin v. City of Chi.*, 341 F.3d 606, 615 (7th Cir. 2003) ("An employer cannot retaliate if there is nothing for it to retaliate against.").

### III. Conclusion

After conducting a de novo review of the record, we conclude that the evidence it contains would not permit a reasonable jury to infer that Davis was discriminated against on the basis of his race or retaliated against for voicing concerns about discrimination. We therefore AFFIRM in full the district court's grant of summary judgment in favor of Time Warner.